1  KEITH A. WEAVER
   Nevada Bar No. 10271
2  **LEWIS BRISBOIS BISGAARD & SMITH LLP**
   6385 S. Rainbow Boulevard, Suite 600
3  Las Vegas, Nevada 89118
   PH.:   702.893.3383
4  FAX:  702.893.3789
   E-Mail: weaver@lbbslaw.com
5  *Attorneys for Defendant Hartford Life and*
   *Accident Insurance Company*
6

7                **UNITED STATES DISTRICT COURT**
8                      **DISTRICT OF NEVADA**
9

10 BARBARA HERTZ,                          CASE NO. 3:12-cv-00141-LRH-RAM
11          Plaintiff,                     **DEFENDANT HARTFORD'S MOTION**
                                           **FOR SUMMARY JUDGMENT**
12     vs.
13 HARTFORD LIFE AND ACCIDENT
14 INSURANCE COMPANY and GROUP
   LONG TERM DISABILITY PLAN FOR
15 EMPLOYEES OF INTUIT, INC.,
16          Defendant.
17

18      Defendant THE HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY

19 ("Hartford"), hereby submits its Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56 and

20 Local Rule 56-1.

21

22

23

24

25

26

27

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

DATED this 27 day of June, 2013

LEWIS BRISBOIS BISGAARD & SMITH LLP

By _____

KEITH A. WEAVER
Nevada Bar No. 10271
6385 S. Rainbow Boulevard, Suite 600
Las Vegas, Nevada 89118
Tel. 702.893.3383
*Attorneys for Defendant Hartford Life and
Accident Insurance Company*

## I.

## INTRODUCTION.

Plaintiff Barbara Hertz ("Hertz") seeks long term disability ("LTD") benefits from an ERISA plan sponsored by her former employer, Intuit, Inc (the "Plan"). Hertz claims she is unable to perform any type of work because of pain stemming from cervical and lumbar degenerative disc disease. For years, Hartford accepted Hertz's subjective complaints of pain and paid her LTD benefits. However, when Hartford conducted a review of Hertz's file, it became clear that she had exaggerated her symptoms. Hertz was observed functioning without any overt signs of pain and at a level she had denied she could function. Based on this new information, Hartford obtained an occupational analysis and identified occupations Hertz could perform in her current condition.

Hartford then terminated Hertz's LTD benefits based on its determination that Hertz's functional capacity was such that she could perform sedentary work. Hertz appealed Hartford's decision to terminate her benefits. As part of the appeals process Hartford obtained an independent medical records review by a board-certified neurologist. The independent reviewer determined that Hertz could perform sedentary work on a full-time basis. Accordingly, Hartford upheld its decision to terminate Hertz's LTD benefits.

Under the Plan, Hartford has discretion regarding claims decisions. Therefore, in

DEFENDANT HARTFORD'S MOTION FOR SUMMARY JUDGMENT

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1 reviewing this case, the Court should employ an abuse of discretion standard of review. Hartford

2 anticipates that Hertz will argue that the Court should employ a heightened abuse of discretion

3 standard of review because of Hartford's alleged structural conflict of interest. (Hartford makes

4 claim decisions and also funds the benefits.) Whatever the level of deference this Court applies,

5 Hartford did not abuse its discretion when it denied Hertz's claim and its decision should be

6 upheld.

## II.

## STATEMENT OF FACTS[1]

### A. PERTINENT PLAN PROVISIONS REQUIRE HERTZ TO PROVIDE OBJECTIVE PROOF THAT SHE WAS UNABLE TO PERFORM "ANY OCCUPATION."

1. Hertz participated in an ERISA governed group welfare benefit plan providing long term disability benefits by virtue of her employment with Intuit, Inc. Hartford issued a group policy of insurance to fund the Plan benefits. Hartford is the claim administrator. (AR 000001-50.)[2]

2. The Plan provides LTD benefits equal to 66 2/3% of the participant's pre-disability income if the participant meets the plan's definition of "Disability" and remains disabled through a 180-day elimination period. (AR 000008-10.) The Plan applies an "Own Occupation" definition of "Disability" for the first 24 months. After that, the more stringent "Any Occupation" definition of "Disability" applies. (AR 000020.) Plan participants are eligible to receive benefits if they prove that they are "Disabled" and satisfy and all other Plan terms. (AR 000001-50.) Subject to all other terms and conditions, the Plan defines "Disability" as follows:

> Disability or Disabled means that during the Elimination Period and for the next

---

[1] Hartford submits its Statement of Facts pursuant to LR 56-1. However, in an ERISA case such as this, where a Court reviews an ERISA benefit decision for abuse of discretion, "a motion for summary judgment is merely the conduit to bring the legal question before the district court and the **usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply.**" *Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999). Instead, the Court will determine whether Hartford abused its discretion when it determined that Hertz was no longer eligible for LTD benefits. *Id.*

[2] Hartford refers the Court to the Administrative Record. (Docs. ## 41-46, 48-48)

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

24 month(s) you are prevented by:

> 1. accidental bodily injury;
> 2. sickness;
> 3. mental illness;
> 4. substance abuse; or
> 5. pregnancy

from performing one or more of the Essential Duties of Your Occupation, and as a result your Current Monthly Earnings are no more than 80% of your Indexed Pre-disability Earnings. After that, you must be prevented from performing one or more of the Essential Duties of Any Occupation.

Your failure to pass a physical examination required to maintain a license to perform the duties of Your Occupation does not alone mean that you are disabled. (AR 000020.)

3.    "Essential duty" is defined by the plan:

Essential Duty means a duty that:

1. is substantial, not incidental;
2. is fundamental or inherent to the occupation; and
3. can not be reasonably omitted or changed. (AR 000021)

4.    "Any Occupation" is defined by the Plan:

Any Occupation means an occupation for which you are qualified by education, training or experience, and that has an earnings potential greater than an amount equal to the lesser of the product of your Indexed Pre-disability Earnings and the Benefit Percentage and the Maximum Monthly Benefit shown in the Schedule of Insurance. (AR 000020.)

5.    The Plan expressly requires the participant to prove her claim. (AR 000011, 18-20.) The Plan provides that benefits will end when a participant no longer provides proof that she meets the Plan's definition of "disabled." (AR 000011.) The Plan further provides that benefits must be reduced by "Other Income Benefits," including Social Security Disability Insurance ("SSDI") benefits, for which a claimant is required to apply. (AR 000012, 18-21.)

6.    The Plan confers broad discretion on Hartford, the plan administrator, to interpret the plan:

**Who interprets policy terms and conditions?**
We [Hartford] have full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Group Insurance Policy. AR 000019.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1  Hartford's claim determinations, including those in issue here, must be reviewed for an abuse of

2  discretion. *Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863 (9th Cir. 2008).[3]

3  **B.     HERTZ STOPS WORKING AND SUBMITS A CLAIM FOR LTD BENEFITS;**

4  **       HARTFORD PAYS.**

5       7.     In October 2006, Hertz was employed as Customer Service Manager at Intuit, Inc.

6  (Am. Compl. ¶ 20, Doc. #10.)  She stopped working on October 13, 2006 due to cervical and

7  lumbar degenerative disc disease. (AR 000069.)  She applied for LTD benefits through the Plan.

8  (AR 000069.)  Hartford approved Hertz's LTD benefits in March 2007. (AR 000051-53; *see also*

9  Am. Compl. ¶ 28, Doc. #10.)  Hertz continued to receive LTD benefits from Hartford through July

10  5, 2011, nearly five years.  (Am. Compl. ¶ 37, Doc. #10.)

11  **C.     HARTFORD REFERS HERTZ'S CLAIM TO ITS SPECIAL INVESTIGATION**

12  **       UNIT AND DETERMINES THAT SHE CAN PERFORM FULL-TIME**

13  **       SEDENTARY WORK.**

14       8.     Hartford routinely evaluates on-going claims such as Hertz's. (AR 000071.)  As

15  part of this review process, Hertz filled out a claimant questionnaire in January 2010 wherein she

16  indicated that she had problems walking, experienced cramping in both her legs, and was losing

17  her ability to concentrate. (AR 000447.)  On the questionnaire Hertz stated "I can't stand or sit for

18  extended period of time.  I cramp up & fall if I try to walk any distance.  My pain levels make it so

19  I have to take pain and seizure meds making activities hard & it's hard to concentrate." (AR

20  000447.)  She also claimed "I get headaches daily that prevent me (sic) any length or

21  concentration to work on computers.  I have to change positions from sitting, walking to lying

22  down (sic)." (AR 000447.)

23       9.     As part of the review process, Hartford tried to reach Hertz at home by phone. (AR

24  000078.)  Hertz's home telephone was answered "Jim's Doggie Diner." (AR 000078.)  This

25

26  _____

[3] The manner in which a reviewing court applies the abuse of discretion standard depends on whether the

27  administrator has a conflicting interest. *Montour v. Hartford Life & Accident Insurance Co.*, 588 F.3d 623, 629 (9th Cir. 2009).

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4827-7188-5332.1                           5                    3:12-cv-00141-LRH-RAM
DEFENDANT HARTFORD'S MOTION FOR SUMMARY JUDGMENT

1  raised a reasonable question about whether Hertz was working. Hertz's claim was referred to

2  Hartford's Special Investigation's Unit[4] for further evaluation. (AR 000078.)

3       10.    Hartford's investigation revealed activities—especially her involvement in the

4  operation of Jim's Old Fashion Doggie Diner (the "Diner")—that called into question Hertz's

5  functional capacities (AR 000283.) For example, in addition to her "home" phone also being used

6  as the business line for the Diner, Hertz had posted a new menu for the Diner on her Facebook

7  account. (AR 000283, 315-316) The investigation revealed that Hertz was listed as the secretary

8  of the Fallon Lion's Club. (AR 000283.) She also had a tow truck registered in her name. (AR

9  000283.)

10      11.    On their face, Hertz's activities appeared inconsistent with her claimed functional

11 capacity. Hartford therefore decided to conduct surveillance on Hertz in order to assess whether

12 her self-reported limitations appeared consistent with her actual functional capacity. (AR

13 000283.)

14      **1.**    ***Surveillance reveals Hertz engaging in activities inconsistent with her alleged***

15           ***functional limitations.***

16      12.    Hartford conducted surveillance on Hertz on four random days in December 2010.

17 (AR 000283.) Hertz was observed performing physical activities inconsistent with her self-

18 reported limitations.[5] (AR 000291-312.) Hertz reported to Hartford that she could not walk or sit

19 for any length of time. Yet Hertz was repeatedly observed driving, lifting and carrying various

20 items, and spending extended periods of time at the Diner. (AR 000291-312.)

21      13.    Surveillance began December 7, 2010. (AR 000291-312). Hertz was away from

22 her residence for approximately 6 consecutive hours. During this time she did not show any

23 apparent functional limitations, or any overt signs of pain or discomfort. (AR 000292-97.)

24 During this time she:

25 _____

26 [4]  This unit is now known as the "Claims Investigative Unit" or "CIU."

27 [5]  Hartford respectfully requests that the Court view the surveillance video manually filed with the Court (Doc. ## 48-49.)

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4827-7188-5332.1                                6                    3:12-cv-00141-LRH-RAM
               DEFENDANT HARTFORD'S MOTION FOR SUMMARY JUDGMENT

- Drove approximately 24 minutes from her residence to Walmart. (AR 000295-96.)
- Shopped at Walmart where she pushed a shopping cart with both hands, carried various items with both hands, loaded her vehicle with various items she had purchased, and entered and exited her vehicle unassisted. (AR 000295-96.)
- Drove approximately 11 minutes from Walmart to the Diner where she remained for approximately 5 hours, from 10:39 am until 3:29 pm. (The Diner's hours were from 8:00 am until 2:00 pm.) (AR 000296-97.)
- Drove approximately 23 minutes to her mailbox where she exited and reentered her vehicle without assistance. (AR 000296-97.)

14.     Similarly, the next day, December 8, 2010, Hertz was away from her residence for approximately 4 consecutive hours. She did not show any signs of functional limitations or any overt signs of pain or discomfort. During this time she:

- Entered her vehicle unassisted and drove approximately 16 minutes to the Diner. (AR 000298.)
- Exited her vehicle unassisted and carried a medium sized box into the Diner. (AR 000298.)
- Left the Diner with a female companion and drove approximately 13 minutes to an unidentified residence. (AR 000299.)
- Carried several items without assistance into the residence. (AR 000299.)
- Drove from the residence back to the diner. (AR 000299.)

15.     Surveillance was conducted again on December 22, 2010.[6] (AR 000303.) On this date, Hertz was away from her residence for approximately 6.5 consecutive hours. She spent nearly 6 hours at the Diner. (AR 000308.) She drove herself to the Diner without any assistance, and she was observed walking up and down the stairs at the Diner without any limitations. (AR

---

[6] Surveillance was also conducted on December 23, 2010. The investigator did not observe Hertz arriving or departing from her residence. However, a sign on the Diner revealed that it would be closed from "December 23 – January 3 for holidays."

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4827-7188-5332.1                                7                            3:12-cv-00141-LRH-RAM
                    DEFENDANT HARTFORD'S MOTION FOR SUMMARY JUDGMENT

1  000308.)

2      16.    In light of the inconsistencies between Hertz's activities and her self reported
3  limitations, Hartford attempted to reach Hertz by phone and in writing to schedule an interview at
4  her residence. (AR 000283.) Hertz did not respond to Hartford. Hartford decided to attempt to
5  interview Hertz at her residence. (AR 000284.)

6      **2.    *Hartford conducts an in-person interview with Hertz wherein she confirms she***
7          ***regularly engages in activities that are inconsistent with her self-reported***
8          ***limitations.***

9      17.    On February 28, 2011, at approximately 8:00 am, the investigator arrived at Hertz's
10 residence. (AR 000283.) Hertz was not home. (AR 000283.) The investigator went to the Diner.
11 (AR 000284.) The Diner was closed. (AR 000284.) The investigator spoke with Jack McKay,
12 the owner of a nearby business. (AR 000284.) Mr. McKay stated that the Diner had been closed
13 for approximately one month for remodeling. (AR 000284.) Mr. McKay reported that when the
14 Diner was open, Hertz spent 2-4 hours there almost every day. (AR 000284.)

15     18.    Hertz apparently learned of the investigator's presence in Fallon. She called and
16 left a number where she could be reached. (AR 000284.) The investigator called Hertz, and tried
17 to arrange an in-home interview with her that day. (AR 000284.) Hertz did not want to be
18 interviewed at her residence. (AR 000284.) She preferred that the investigator meet with her at a
19 casino restaurant in Fernley, Nevada, in order to conduct the in-person interview. (AR 000285.)

20     19.    At the in-person interview, Hertz told the investigator that she could not work in
21 any occupation because of severe and chronic lower back and hip pain. (AR 000285.) However,
22 Hertz admitted that she could independently and without the use of special equipment:

23     •    walk slowly for 15 to 20 minutes;

24     •    stand for 15 to 20 minutes;

25     •    perform all of her own shopping;

26     •    lift and carry items weighing between 5 to 10 pounds;

27     •    push and pull things that require slight resistance;

28     •    reach to her front, sides, and below her waist;

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4827-7188-5332.1                                   8                        3:12-cv-00141-LRH-RAM
DEFENDANT HARTFORD'S MOTION FOR SUMMARY JUDGMENT

1    •     walk up and down stairs and steps using a handrail;

2    •     fully use her hands and fingers;

3    •     read without restriction;

4    •     drive short distances in her community;

5    •     sit for approximately 20 to 30 minutes at a time; and

6    •     dress and perform her own personal hygiene.  (AR 000287-89.)

7         20.     When asked about her involvement in the Diner, Hertz stated that she and her

8    husband had opened the Diner in January of 2010 and that it was currently closed for remodeling.

9    (AR 000288.)  She denied actively working in the business. (AR 000288.)  However, she stated

10   that because her husband had another job, when he could not be at the Diner she would supervise

11   the employees and "insure that all goes smoothly." (AR 000288.)  She estimated that her

12   activities at Diner equated to approximately 4 to 5 hours a week.[7]  (AR 000288.)

13        21.     The investigator also asked Hertz about her involvement in the Fallon's Lions

14   Club. (AR 000288.)  Hertz acknowledged that she was the secretary for the Fallon's Lions Club.

15   (AR 000288.)  As the secretary, her duties included taking notes and recording the minutes of the

16   club's meetings.  The meetings were approximately once a week for approximately 1 hour. (AR

17   000288.)

18        22.     The investigator informed Hertz that surveillance that had been conducted. (AR

19   000289.)  The activities captured on the surveillance videos were described to Hertz. (AR

20   000289.)  She confirmed that she was the subject of the surveillance videos. (AR 000289.)  Hertz

21   acknowledged that the activities observed during the surveillance would accurately memorialize

22   her levels of restriction.  (AR 000289.)

23        23.     Despite Hertz's claims that she could only sit for 20 to 30 minutes at time, during

24   the in-person interview she stayed seated and did not exhibit any signs of pain.  The in-person

25   interview lasted approximately 1 hour and 5 minutes.  (AR 000285.)

26

27   _____

[7]  During only two randomly chosen days of surveillance, Hertz spent approximately 7 hours at the Diner.

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

3. *Hertz primary care physician confirms that Hertz is able to work full time in a sedentary occupation.*

24.     In light of the investigation that confirmed that Hartford was performing at a functional capacity much higher than she had claimed, Hartford's claims department obtained Hertz's updated medical records and reviewed them in detail.  (AR 000077-81, 321, 390, 393.) Based on the medical records and the investigative material (including the surveillance and the in-person interview), Hartford determined that Hertz was capable of performing full-time sedentary work with certain restrictions.  (AR 000077-81.)

25.     Hartford sent correspondence to Tracey Green, M.D., Hertz's primary care physician, inquiring whether Dr. Green agreed with Hartford's assessment that Hertz would be capable of working full-time in a sedentary occupation with occasional standing/walking, full use of her upper extremities, occasional lifting or carrying 0-10 pounds, and the ability to stand and move around as needed.  (AR 000218.)  In a letter dated June 6, 2011, **Dr. Green fully agreed with Hartford's assessment that Hertz should be able to work in a full-time in a sedentary occupation.**[8]  (AR 000218.)  (Emphasis added.)

D.     **AFTER ADDITIONAL INVESTIGATION HARTFORD TERMINATES HERTZ'S CLAIM.**

26.     After determining that based on her functional capacity Hertz should be able to work full-time in a sedentary occupation, Hartford obtained an employability analysis report ("EAR"). (AR 000238-69.)  The EAR considered Hertz's education, work history, and physical limitations.  The EAR identified several sedentary clerical and office management occupations suitable for Hertz.  These occupations included office manager, accounting supervisor, billing-control clerk, and invoice-control clerk.  (AR 000239.)

27.     After determining Hertz's functional capacity and identifying several sedentary

---

[8] Dr. Green would later backtrack and state that Hertz was not able to perform any type of work.

1  occupations that she could perform, Hartford notified Hertz in a July 5, 2011 letter that it was

2  terminating her LTD benefits. (AR 000077-81.) Hartford explained that there was a wide

3  disparity between Hertz's reported and observed functionality, and that her own treating physician

4  Dr. Green agreed that she was capable of performing full-time work in a sedentary occupation.

5  (AR 000077-81.)

6  **E.    HERTZ APPEALS HARTFORD'S DECISION TO TERMINATE HER BENEFITS.**

7          28.    In a July 10, 2011 letter, Hertz notified Hartford that she intended to appeal

8  Hartford's decision to terminate her benefits. (AR 000085-87.)[9] Hertz contested Hartford's

9  reasons for terminating her benefits. (AR 00085-87.) First, Hertz disputed Hartford's reliance on

10  the surveillance that showed her "operating a motor vehicle, carrying items, and staying at Jim's

11  Doggie Diner for extended periods of time." (AR 00085.) Hertz admitted that she occasionally

12  drove short distances, but that her husband drove 95% of the time due to the effects of her

13  medications. (AR 00085.) Hertz also admitted that the she was "able to lift some items" when

14  she went grocery shopping, but that she was "careful to stay within the 10 lb. limitations" she had.

15  (AR 00085.) Hertz stated that when she occasionally lifted heavier objects, she suffered "serious

16  side effects." (AR 00085.)

17          29.    Second, Hertz attempted to minimize her involvement at the Diner. (AR 00085-

18  86.) Hertz claimed that the reason her "home" phone was answered as "Jim's Doggie Diner" was

19  because it was a rural mobile number that could be plugged into any electrical outlet for use, and

20  her husband had taken the "home phone" to the Diner to use. (AR 00085-86.) Hertz admitted,

21  however, that she would occasionally review the books because that was her "expertise" and she

22  "worked as a consultant for [her husband], so he could prepare the information correctly." (AR

23  00086.)

24          30.    Third, Hertz admitted that she sat through the 1 hour and 5 minutes in-person

25  interview with the investigator. But she claimed that she experienced discomfort, and she had

26

27

[9] In a letter dated August 26, 2011, Hertz formally requested an appeal.

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4827-7188-5332.1                                    11                        3:12-cv-00141-LRH-RAM
                    DEFENDANT HARTFORD'S MOTION FOR SUMMARY JUDGMENT

1  difficulty walking afterwards.  (AR 00086.)

2      31.  Fourth, Hertz stated that she was on narcotics and anti-seizure medicine.  (AR

3  00086.)  She stated that she was hospitalized in April 2011, because of spasms and pain.  (AR

4  00086.)  She was discharged on pain medications "because they cannot do much else for me."

5  (AR 00086.)  She was also hospitalized in June 2011, when she abruptly stopped her pain

6  medications because she lost her health insurance coverage.  (AR 00086.)  Hertz stated she was

7  "working hard to improve her stamina for sitting and standing" and that she "[tried] to walk

8  daily," so she didn't lose her flexibility.  (AR 00086.)

9      32.  Fifth, Hertz stated that there was no place within 55 miles that she could earn even

10  close to 80% of her previous income.  Because she could no longer drive long distances, working

11  67 miles away in Reno was out of the question. (AR 00087.)

12      33.  In a letter dated August 31, 2011, Hartford notified Hertz that her appeal was

13  assigned to the Appeal Unit, a department completely separated from the Claims Department.

14  (AR 00066.)  Hartford explained that the Appeals Unit would independently investigate her claim.

15  (AR 00066.)

16  **F.  A BOARD CERTIFIED NEUROLOGIST CONDUCTS AN INDEPENDENT**

17      **REVIEW OF HERTZ'S CLAIM AND DETERMINES THAT HERTZ IS ABLE TO**

18      **PERFORM FULL-TIME SEDENTARY WORK.**

19      34.  Hartford referred Hertz's file for an independent medical review through MLS

20  Group of Companies, Inc. ("MLS").  (AR 000153-162.)  In order to determine Hertz's functional

21  capacity, board certified neurologist, Choon Rim, M.D., reviewed Hertz's medical records,

22  interviewed her treating physicians, and watched the surveillance videos.  (AR 000109-115, 145-

23  146, 156-164.)

24      **1.  *Dr. Rim's reviews Hertz's medical records and finds no objective evidence of***

25         ***impairment.***

26      35.  Dr. Rim conducted a complete and detailed review of Hertz's medical records

27  dating back to 2007.  (AR 000153-64.)  Dr. Rim determined that although Hertz had *subjective*

28  complaints of pain, there was no *objective* evidence of any current condition that would preclude

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

Hertz from working in a full-time sedentary occupation.  (AR 000160-61.)  For example, Dr. Rim noted from the records:

- On July 6, 2010, Hertz had good strength of the upper and lower extremities.  She was referred to Dr. Quaglieri for an EMG due to intermittent cramping of her hands.  The EMG revealed bilateral chronic C5-C6 changes of reinnervation and **no active cervical motor radiculopathy**.  (AR 000156.)

- On September 20, 2010, Hertz stated that she **continued to be active on a daily basis** while taking two or three, at times four pain pills a day.  (AR 000156.)

- On March 29, 2011, although Hertz was complaining of increasing pain in her lower legs, a **general physical examination was normal and a neuromuscular examination revealed no atrophy and no foot drop**, but significantly limited range of motion with ambulation and difficulty going from sitting to standing.  (AR 000156.)

- On June 6, 2011, Hertz's primary care physician, Tracy Green, M.D., agreed that Hertz had the ability to function to perform activities such as 40 hours per week, primarily sitting in nature, and lifting and limited carrying of to 0 to 10 pounds on an occasional basis.  (AR 000156.)

- On July 29, 2011, Dr. Green determined that Hertz's **general physical examination was normal.**  However, after Hertz's benefits were terminated, Dr. Green recanted and then opined that Hertz was unable to do any kind of work.  (AR 000156-57.)

2.  *Dr. Rim's interviews with Hertz's treating physicians confirm that Hertz's complaints are subjective in nature and that there is no objective evidence of impairment.*

36.  Dr. Rim engaged in a telephonic peer to peer consultation with Hertz's treating physician, neurosurgeon, Jay Morgan, M.D., on September 27, 2011.  (AR 000157.)  Dr. Morgan opined that Hertz's motivation to work was low and that her symptoms were subjective in nature. (AR 000157.)  Dr. Morgan reported that since Hertz had been placed on disability she had

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4827-7188-5332.1                                         13                                    3:12-cv-00141-LRH-RAM
DEFENDANT HARTFORD'S MOTION FOR SUMMARY JUDGMENT

1  undergone multiple successful spinal surgeries, and that when he last examined her she showed no

2  weakness. (AR 000157-58.) Despite not evaluating Hertz for nearly a year, Dr. Morgan

3  inexplicably continued to opine that Hertz was unable to work, but suggested that a functional

4  capacity assessment may be warranted. (AR 000157-58.)

5      37.   Next, on September 28, 2011, Dr. Rim engaged in a telephonic peer to peer

6  consultation with Hertz's primary care physician, Tracey Green, M.D. (AR 000158.) **Dr. Green**

7  **reported to Dr. Rim that from an internal medicine standpoint, Hertz did not have any**

8  **conditions that would preclude her from doing full-time sedentary work**. (AR 000158.) Dr.

9  Green confirmed that Hertz's main complaint was pain, and agreed that it was difficult to assess

10 the degree or severity of the pain without objective findings to indicate any underlying disease

11 process causing the pain. (AR 000158.) Nevertheless, Dr. Green opined that Hertz was unable to

12 work. (AR 000158.) When Dr. Rim told Dr. Green about the video surveillance of Hertz, Dr.

13 Green responded that perhaps Hertz had gotten worse since December and suggested that she may

14 need some further surgery.[10] (AR 000158.) In other words, Dr. Greene was suggesting that

15 Hertz's condition worsened between the time of the December 2010 surveillance, and Dr.

16 Greene's July 2011 examination of Hertz. But Hertz herself does not contend her condition

17 worsened during that time. The only thing that changed was that Hertz denied Hartford's appeal

18 which was based in part on Dr. Greene's previous determination that Hertz could work.

19     38.   Charles E. Quaglieri, M.D., Hertz's treating neurologist, refused to speak with Dr.

20 Rim and requested that any communications with Dr. Rim be in writing. (AR 000158.) In a letter

21 dated October 5, 2011, Dr. Quaglieri reported that he had not seen Hertz since February 2010. (AR

22 000159.) Like Drs. Green and Morgan, Dr. Quaglieri acknowledged that Hertz had no definite

23 cervical and lumbar radiculopathy supported by any objective evidence. He also stated on

24 examination there was no evidence of radiculopathy, myelopathy or neuropathy. (AR 000159.)

25 ───────────────

26 [10] In other words, Dr. Greene was suggesting that Hertz's condition worsened between the time of the December
   2010 surveillance, and Dr. Greene's July 2011 examination of Hertz. But Hertz does not contend her condition

27 worsened during that time. The only thing that changed was that Hertz denied Hartford's appeal which was based in
   part on Dr. Greene's previous determination that Hertz could work.

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1  Dr. Quaglieri stated that he had no neurologic explanation for Hertz's pain. (AR 000159.)

2  However, since Dr. Quaglieri had not seen Hertz in approximately one and one-half years, he

3  would not opine whether she could work on a full-time basis. (AR 000159.)

4      39.    Based on his review of the surveillance, the medical records, and his consultations

5  with Hertz's treating physicians, Dr. Rim concluded that there was no *objective* evidence of

6  impairment to preclude Hertz from sedentary employment on a full time basis with certain

7  restrictions as of July 1, 2011. [11] (AR 000160-61.)  Dr. Rim noted that neuroradiological studies

8  including MRIs did not demonstrate any structural lesion in the cervical or lumbar spine to cause

9  complaints of pain; EMG studies did not reveal any myelopathy, radiculopathy or neuropathy;

10  neurological examinations did not show any significant anatomical lesions to cause neuropathy,

11  radiculopathy or myelopathy. (AR 000160-61.)

12      **3.**    ***Dr. Rim's review of Hertz's updated medical records does not change his***

13             ***opinion.***

14      40.    Following his initial report, Dr. Rim provided 2 addendums based on new medical

15  records that he received after Hertz sought treatment after she appealed the termination of her

16  benefits. (AR 000145-46.)  In the first addendum, dated November 7, 2011, Dr. Rim opined that

17  according to Dr. Quaglieri, Hertz was not having any adverse reactions to her medications, nor

18  were her medications causing any cognitive impairment. (AR 000145-46.)

19      41.    Dr. Rim provided an additional addendum on December 15, 2011, after he received

20  updated medical records from Drs. Morgan and Quaglieri. (AR 000109-12.)  Dr. Rim's opinion

21  that Hertz could work full time in a sedentary occupation as of July 1, 2011 remained unchanged.

22  (AR 000111.)  He noted that the updated medical records showed mild weakness of the left lower

23  extremity and possible peripheral neuropathy. (AR 000111.)  However, neither of these

24

25  [11] The restrictions Dr. Rim suggested were:  standing and walking up to 10 minutes at a time and 2 hours in total in an

26  8 hour day; unrestricted sitting (with intermittent breaks); frequent lifting and carrying up to 5 pounds and occasional
lifting and carrying up to 10 pounds, pushing and pulling up to 10 pounds occasionally; occasional restriction of

27  reaching above or below shoulder level; and five pounds frequently and 10 pounds occasionally, pushing and pulling
are 10 pounds occasionally, and unrestricted use of both upper extremities

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4827-7188-5332.1                                    15                        3:12-cv-00141-LRH-RAM
DEFENDANT HARTFORD'S MOTION FOR SUMMARY JUDGMENT

1  conditions were confirmed by objective testing as a recent EMG and nerve conduction study were
2  both normal. (AR 000111.) Moreover, most of Hertz's symptoms continued to be "self-reported
3  pain." (AR 000111.) Thus, Dr. Rim's opinion that Hertz could engage in full-time work in a
4  sedentary occupation did not change. (AR 000111.)

5  **G.     HARFORD UPHOLDS IT DECISION TO TERMINATE HERTZ'S LTD**
6          **BENEFITS.**

7          42.     Based on its investigation, Hartford upheld its decision to terminate Hertz's LTD
8  benefits. (AR 000069.) Hartford notified Hertz of its decision by written correspondence dated
9  January 10, 2012. (AR 000069.) Hartford explained that in making its determination it had relied
10 on evidence including:  Hertz's medical records; the opinions of Hertz's treating physicians; Dr.
11 Rim's report; the EAR; Hertz's self-reported and observed activities of daily living which
12 "provide[d] a picture of function in spite of any medical conditions." (AR 000072.) Hartford
13 specifically noted that while Hertz had some minimal objective findings of impairment on
14 physical/clinical testing, there was no objective evidence to support that Hertz had any functional
15 impairment that would preclude her from performing full-time sedentary work. (AR 000071.)

16         43.     Harford also explained to Hertz that it had considered any social security
17 administration ("SSA") determinations when it evaluated her appeal. (AR 000071.) Hartford
18 explained that while the SSA disability determination was one piece of evidence, it was not
19 conclusive because the standards governing SSDI benefits and LTD disability benefits under the
20 Plan differed. (AR 000071.) For instance, Hartford explained that unlike the requirement that the
21 SSA give special heed to the opinion of a claimant's treating physician, Hartford was not required
22 to do so. (AR 000071.) And while the SSA typically only conducted follow-up disability reviews
23 every 1-5 years, Hartford conducted such reviews at least yearly. (AR 000071-72.)

24         44.     Hartford advised Hertz in the January 12, 2012 letter that she had exhausted her
25 administrative remedies under ERISA. She was entitled to bring a civil action under Section
26 502(a) of ERISA. (AR 000071.) Hence, this lawsuit.

27

28                                            **III.**

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4827-7188-5332.1                              16                    3:12-cv-00141-LRH-RAM
                  DEFENDANT HARTFORD'S MOTION FOR SUMMARY JUDGMENT

1                                          **LEGAL ARGUMENT**

2        This case is governed by the Employee Retirement Income Security Act of 1974

3 ("ERISA"), 29 U.S.C. §§ 1001, et seq. Where a Court reviews an ERISA benefit decision for

4 abuse of discretion, "a motion for summary judgment is merely the conduit to bring the legal

5 question before the district court and the usual tests of summary judgment, such as whether a

6 genuine dispute of material fact exists, do not apply." *Bendixen v. Standard Ins. Co.*, 185 F.3d

7 939, 942 (9th Cir. 1999). Accordingly, rather than deciding whether Hertz's ERISA claim should

8 proceed to trial based on whether or not a genuine dispute over a material fact exits, this Court will

9 here decide the merits of the case (that is, whether Hartford abused its discretion). For the reasons

10 set forth below, Hartford did not abuse its discretion when it determined that Hertz was no longer

11 entitled to long-term disability benefits. Therefore, the Court should enter judgment in favor of

12 Hartford.

13 **A.**      **HARTFORD'S CLAIM DECISION MUST BE REVIEWED FOR AN ABUSE OF**

14           **DISCRETION.**

15        Where an ERISA plan confers discretion on the plan administrator, the court must review

16 the claim decision for an abuse of discretion. *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008);

17 *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006). In *Glenn*, the Court

18 explained that in order to determine whether an administrator abused its discretion, a court should

19 "take account of several different considerations of which a conflict of interest is one." *Id.* The

20 weight given to the conflict of interest will be less important, "**perhaps to the vanishing point**,"

21 where . . . the claim administrator "take[s] active steps to reduce potential bias and to promote

22 accuracy" by doing such things as separating claim examiners from the company's finances,

23 evaluating employees without consideration of numbers or claims approved or denied, providing

24 each claimant with an individual, independent review, and separating the appeals unit from those

25 who make initial claim determinations. *Id.* at 117 *(*emphasis added); *see also Aluisi v. Unum Life*

26 *Ins. Co. of America,* 407 Fed.Appx. 126 (9th Cir. 2010) (evidence that plan administrator with

27 structural conflict implemented procedures to eliminate bias minimized the importance of the

28 conflict).

DEFENDANT HARTFORD'S MOTION FOR SUMMARY JUDGMENT

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1    Notably, in *Glenn*, the Court did not hold that a conflict is significant in every case. In
2  fact, the Supreme Court recognized that the district court did not rely exclusively, or even
3  predominantly, on the conflict to find that the claim administrator abused its discretion and noted
4  with approval that "[t]he [lower] court instead focused more heavily on other factors," including
5  that the plan administrator supposedly failed to provide all the claimant's medical records to its
6  physician reviewers. *Id.* at 106.

7    A number of federal courts have acknowledged Hartford's lack of bias in its handling of
8  ERISA claims. For example, in *Fortune v. Group Long Term Disability Plan for Employees of*
9  *Keyspan Corp.*, 637 F.Supp.2d 132, 144 (E.D.N.Y. 2009), the court held that it "is satisfied that
10  Hartford has taken active steps to cure any structural conflict of interest. Hartford has effectively
11  'walled-off' claims examiners from the company's finance department by ensuring that an
12  examiner's compensation is not determined by reference to his or her record in denying claims.
13  Hartford has also created a check against the arbitrary denial of claims and sought to promote
14  accuracy by maintaining a separate appeal unit that independently considers claims that were
15  denied upon initial review." *See also Mugan v. Hartford Life Group Ins. Co.*, 2011 U.S. Dist.
16  LEXIS 6961, *33 (S.D.N.Y. 2011) (S.D.N.Y. 2011) (stating "Hartford's corporate structure and
17  policies **have abated the risk that Hartford's conflict affected its decision**. . . . Hartford has
18  taken active steps to reduce structural biases and to promote accuracy in its claim administration
19  process.") (emphasis added).

20    In this case, the structural conflict of interest is not substantial. Hartford takes broad
21  measures and great care to ensure that the financial performance of the company has no impact on
22  or relevance to the administrative determinations made by Hartford's claims personnel. For
23  example:

24      • Hartford maintains a separate appeals unit for the consideration of claims that have
25        been denied by the claims department on its initial review;

26      • Each Appeals Specialist in Hartford's appeals unit is charged with making an
27        independent assessment of the adverse claim decision based on relevant provisions

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4827-7188-5332.1                              18                        3:12-cv-00141-LRH-RAM
DEFENDANT HARTFORD'S MOTION FOR SUMMARY JUDGMENT

in the governing Plan/policy and upon all of the evidence contained in the claim file;

- During the Appeals Specialist's review of a denied claim on administrative appeal, the individual responsible for the appeal does not discuss the merits of the claim with the Claim or Investigative Analyst who made the initial benefits determination, or the Manager of LTD Claims or Claims Specialists, who approved the determination;

- In evaluating claims under employee benefit plans insured by Hartford, it is Hartford's practice and intention to review such claims fairly, without regard to the manner in which the plan is funded, and to consistently award benefits on claims that are entitled to payment pursuant to the provisions of the applicable benefit plan while consistently denying claims that are not entitled to such payments. Hartford administers claims in substantially the same manner whether it is doing so under a fully insured policy or pursuant to an administrative services only agreement;

- Hartford recognizes that awarding benefits on claims that are not eligible for payment under the applicable plan/policy does not benefit all of the persons insured under that plan/policy as a group. Instead, such payments could result in increased premiums and/or a reduction or elimination of benefits by the employer, which will ultimately work to the detriment of all participants and beneficiaries of a given plan;

- Hartford does not provide LTD Claims Analysts, Investigative Analysts, Claims Specialists, Managers of LTD Claims, or Appeals Specialists with incentives, remuneration, bonuses, awards, achievements, or other recognition based in whole or in part upon the denial or termination of claims. Hartford's claims decision-makers are paid fixed salaries and performance bonuses that are wholly unrelated to the number of claims paid or claims denied;

- Hartford's LTD Claims Analysts, Investigative Analysts, Claims Specialists, Managers of LTD Claims, and Appeals Specialists are evaluated on the quality and

1        accuracy of their claims decisions in accordance with the applicable plan/policy

2        documents. Hartford does not discourage its claim decision-makers from paying

3        legitimate claims;

4   •  Hartford's LTD Claims Analysts, Investigative Analysts, Claims Specialists,

5        Managers of LTD Claims, and Appeals Specialists are not involved in Hartford's

6        financial decisions, including, but not limited to, any review or analysis of

7        Hartford's financial performance, or the financial performance or claims

8        experiences of any particular long-term disability plan insured by Hartford;

9   •  Hartford's CIU claims department and appeals unit are completely separate

10       business units from the financial and underwriting departments;

11  •  Neither CIU claims nor appeals personnel seek approval of Hartford financial

12       underwriters in connection with their decision-making on claims for disability

13       benefits;

14  •  Hartford's financial and underwriting departments do not advise or influence CIU,

15       the claims department or the appeals unit with respect to the denial or termination

16       of a claimant's benefits. Indeed, these units are kept separate from each other; and

17  •  The office of the Chief Financial Officer of Hartford, and its affiliate, subsidiary or

18       parent companies, do not have any involvement and do not participate in claims

19       decisions on disability benefits at any level. (*See* affidavit of Bruce Luddy attached

20       hereto as **"Exhibit A"** and incorporated herein by reference.)

21    Accordingly, the Court should not permit the "bare existence of a conflict" to undermine

22 the bargained-for discretion set forth in the plan. As cautioned by the Supreme Court in *Glenn*,

23 where a plan administrator takes active steps, such as those taken by Hartford (identified above) to

24 reduce potential bias and to produce accuracy, the weight given to the structural conflict of interest

25 will be to the vanishing point. *See Glenn*, 554 U.S. at 117.

26    The administrative record reflects that Hartford diligently investigated Hertz's claim and

27 appeal, and reasonably terminated her benefits based on substantial evidence in the record.

28 Therefore, the evidence in the administrative record does not warrant a modification of the

LEWIS BRISBOIS BISGAARD & SMITH LLP
ATTORNEYS AT LAW

1 traditional abuse of discretion standard.

2 **B.   HERTZ DID NOT PROVE THAT SHE WAS UNABLE TO PERFORM IN ANY**
3 **OCCUPATION.**

4      Under 29 U.S.C. §1132, a plan participant may bring a civil action "to recover benefits due
5 to the participant under the terms of his plan. . . ." 29 U.S.C. § 1132(a)(1)(B).  A plaintiff suing
6 under this statute bears the burden of proving an entitlement to plan benefits. *Muniz v. Amec*
7 *Constr. Mgmt.*, 623 F.3d 1290, 1294 (9th Cir. 2010).  "It is at all times a claimant's burden to
8 support and prove her claim." *Dyer v. Metro. Life Ins. Co.*, 2008 U.S. Dist. LEXIS 82617, p. 22
9 (C.D. Cal. Aug. 18, 2008).  In this case, the policy also places the burden on Hertz to provide proof
10 of her disability before it will pay her benefits.  (HART-POLICY-00011, 18-20.)

11      In order to prove disability, a claimant must give objective proof that they are disabled, for
12 "the very concept of proof connotes objectivity." *Maniatty v. UnumProvident Corp.,* 218
13 F.Supp.2d 500, 504 (S.D.N.Y. 2002) (where plan required "proof" but did not explicitly state that
14 proof must be "objective," not abuse of discretion to require objective evidence); *see also Seleine*
15 *v. Fluor Corp. Long-Term Disability Plan,* 409 Fed.Appx. 99 (9th Cir. 2010) (upholding denial
16 where IME found that "significant subjective complaints" were "grossly disproportionate" to
17 objective findings).  Even if the Plan does not explicitly require objective medical evidence of a
18 disability, a plan administrator may still require objective medical evidence.  For example, in
19 *Walker v. Metropolitan Life Insurance Co.* 2010 WL 1946898 (C.D. Cal. 2010), the court held
20 that, because the administrator had discretion under the plan document, it further "had the
21 discretion to require objective evidence even if the Plan Document was silent as to the appropriate
22 criteria." *Id.* at 13.[12]

23      A diagnosis, standing alone, does not establish that a claimant cannot work, and it is a

24 _____

25 [12] *See also Cusson v. Liberty Life Assur. Co.,* 592 F.3d 215 (1st Cir. 2010) (not arbitrary to require objective evidence
of functional impairment); *McDonald v. Hartford Life Group Ins. Co.,* 2010 WL 183431 (5th Cir. 2010) (same);
26 *Speciale v. Blue Cross and Blue Shield Ass'n,* 538 F.3d 615, 622 (7th Cir. 2008) (same); *Williams v. Aetna Life Ins.
Co.,* 509 F.3d 317, 322 (7th Cir. 2007) (reasonable to require evidence of functional limitation that can be objectively
27 measured); *Jackson v. Prudential Ins. Co.,* 530 F.3d 696 (8th Cir. 2009) (determination that record lacked objective
evidence of cognitive impairment was neither arbitrary nor capricious).

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1   proper exercise of discretion for a plan to find a claimant not "disabled," where there is

2   insufficient evidence of functional impairment. *Pralutsky v. Metropolitan Life Ins. Co.,* 435 F.3d

3   833 (8th Cir. 2006) (reasonable to require objective evidence of functional impairment for

4   fibromyalgia, rather than accept statement of physician who merely repeated patient's subjective

5   complaints). Even if a claimed disability is based upon a condition that cannot itself be verified

6   by objective evidence, it is still the case that "the *physical limitations* imposed by the symptoms of

7   such illnesses *do* lend themselves to objective analysis." *Boardman v. Prudential Ins. Co.,* 337

8   F.3d 9, 16 n.5 (1st Cir. 2003) (emphasis added). Moreover, when making a determination, a plan

9   administrator may consider the fact that there is a lack of objective evidence of functional

10   impairment. *See, e.g., Wiley v. Cedent Corp. Disability Plan,* 2010 WL 309670 ,*9 (N.D. Cal.

11   2010).

12         Here, the Plan plainly confers discretion on the plan administrator, Hartford. Per the Plan

13   provisions, Hertz was required to prove by *objective* evidence that she was not able to perform

14   "Any Occupation." Hartford did not dispute that Hertz had multiple medical conditions. But that

15   fact alone did not establish her eligibility for benefits under the Plan. Rather, Hertz was required

16   to prove that her medical conditions caused functional impairments sufficient to render her

17   "Disabled" under the plan. In short, Hertz was required to provide *objective* evidence to Hartford

18   that her purported disabling medical conditions prevented her from performing "Any Occupation."

19         Hertz and her treating physicians were aware that they needed to provide Hartford

20   *objective* evidence of her inability to work in "Any Occupation." But they did not. All of Hertz's

21   treating physicians opined that Hertz's complaints were *subjective* in nature. Given the absence of

22   objective evidence of functional limitations and restrictions, Hartford did not abuse its discretion

23   in declining to provide Hertz with continuing benefits.

24         In addition, Hartford *did* consider Hertz's subjective complaints before terminating her

25   LTD benefits. In his review, Dr. Rim considered Hertz's subjective complaints, including pain.

26   Dr. Rim noted that all of Hertz's treating physicians relied on Hertz's subjective complaints in

27   assessing her functionality. Based on the opinions of Hertz's treating physicians, Dr. Rim opined

28   that Hertz had some restrictions. In effect, Hartford agreed with these restrictions when it

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1 | determined that Hertz could work full time in a sedentary occupation.

2 | **C.   IN ADDITION TO THE FACT THAT HERTZ DID NOT PROVE HER**

3 | **ENTITLEMENT TO CONTINUING BENEFITS, THE EVIDENCE AS A WHOLE**

4 | **SUPPORTS HARTFORD'S CLAIM DETERMINATION.**

5 |     **1.   *The surveillance video and report alone support a conclusion that the benefit***

6 |         ***determination was not an abuse of discretion.***

7 |     Courts routinely uphold the use of surveillance videos to assess a claimant's level of

8 | functionality.  For example, in *DeBenedictis v. Hartford Life and Acc. Ins. Co.*, 701 F.Supp.2d

9 | 1113, 1127 (D.Ariz. 2010), a case where the plaintiff claimed he was wrongly denied benefits, the

10 | plan administrator[13] conducted surveillance and observed the plaintiff engaging in activities that

11 | he claimed he was incapable of performing including: "hopping" in and out of his truck, lifting

12 | parcels, and walking with little to no difficulty.  *Id.*  In *DeBenedictis*, the plaintiff claimed that the

13 | plan administrator over-relied on the surveillance video because it only showed him engaged in

14 | activity for a few hours whereas there were over 40 hours of surveillance where he was engaged in

15 | little to no activity.  *Id.* at 1126.  The court disagreed stating that the "observed activity was

16 | inconsistent with plaintiff's self-reported limitations.  Plaintiff claims that he was observed on a

17 | 'good day,' but given the dramatic difference between the limitations claimed and those observed,

18 | the court is unconvinced that the level of activity observed was a rare occurrence.  Defendant's

19 | reliance on the surveillance was not improper or evidence of bias." *Id.* at 1127.  *See also Aluisi v.*

20 | *Unum Life Ins. Co. of America*, 407 Fed. Appx. 126 (9th Cir. 2010) (plan administrator's decision

21 | was not an abuse of discretion where surveillance video provided objective evidence contradicting

22 | claimant's assertion that he had unbearable pain).

23 |     Here, the surveillance was one piece of evidence that Hartford properly considered in

24 | determining that Hertz did not meet the Plan's definition of disability.  Indeed, it is compelling

25 | evidence considering that: (a) Hartford had been paying benefits to Hertz for years largely based

26 |

27 | ───────────

28 | [13] The plan administrator in this case was also Hartford.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4827-7188-5332.1                      23                      3:12-cv-00141-LRH-RAM
DEFENDANT HARTFORD'S MOTION FOR SUMMARY JUDGMENT

1   on Hertz's subjective complaints and self-reported limitations for which it had little, if any,

2   objective evidence; (b) Hertz was observed spending extended periods of time at her "husband's

3   business" where she admittedly "filled in" when he was at his other job and performed book

4   keeping duties despite her claims that she had difficulty concentrating; (c) Hertz was observed

5   doing (with no apparent signs of pain or discomfort) activities that she had maintained for years

6   she was physically incapable of doing; (d) Hertz was not being routinely treated by her regular

7   neurologist or neurosurgeon for her allegedly debilitating symptoms—for example, she had not

8   seen her neurologist in almost 1.5 years; (e) her primary care physician opined that Hertz was

9   capable of sedentary work, but changed her opinion only after Hertz's benefits were denied.

10          Hartford properly relied on surveillance to evaluate Hertz's claim.  In addition to the

11   surveillance, Hartford relied on other substantial evidence in determining that Hertz's benefits

12   should be terminated.  In light of all the evidence, it was not an abuse of discretion for Hartford to

13   terminate Hertz's benefits.

14          **2.**      ***Dr. Rim's report supports that Hartford's benefit determination was not an abuse***

15                   ***of discretion.***

16          Plan administrators' use of and reliance upon the opinions of independent physicians has

17   been approved by many courts.  *See, e.g. Watson v. Metropolitan Life Ins. Co., Inc.* 2012 WL

18   5464986, 1 (Dist. Ariz. 2012).  Indeed, ERISA requires outside medical opinions in certain

19   circumstances.  *See* 29 C.F.R. § 2560-503-1(h)(3)(iii), (4).  Also, a plan administrator is *not*

20   required to defer to the opinion of the claimant's treating physician.  *Black & Decker Disability*

21   *Plan v. Nord,* 538 U.S. 822, 834 (1989).  A court cannot impose on a plan administrator a discrete

22   burden of explanation when they credit reliable evidence that conflicts with a treating physician's

23   evaluation.  *Id.*

24          Furthermore, the fact that a plan administrator pays an independent third party vendor for

25   an independent physician review is not evidence showing an abuse of discretion, nor is it evidence

26   that a conflict of interest affected the benefit determination.  *See Lee v. Kaiser Foundation Health*

27   *Plan Long Term Disability Plan,* 812 F.Supp.2d 1027, 1039 (N.D.Cal. 2011), *see also Magera v.*

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1  *Lincoln Nat'l Life Ins. Co.*, 2009 WL 3837265, 2009 U.S. Dist. LEXIS 106440 (M.D.Pa. Nov. 16,

2  2009) (holding that where reviewers received compensation regardless of the conclusion they

3  reached in their reports, possibility for any potential conflict in the review process was lowered

4  and the fact that administrators paid for the review was not evidence of conflict because it was

5  common practice, and third party vendor was paid for reports regardless of opinion of independent

6

7  physician).

8      Dr. Rim's reports demonstrate a thorough consideration of the available information.  Yet

9  without a shred of evidence, Hertz has repeatedly impugned the integrity of Hartford, MLS, and

10  Dr. Rim by repeatedly alleging that Hartford "purchased" a favorable records review.[14]  (*See e.g.*

11  Mtn. For Leave to Conduct Limited Discovery into the Nature, Extent, and Affect of Hartford's

12  Conflict of Interest, Doc. #16.)  Dr. Rim's review demonstrates that he carefully reviewed and

13  summarized Hertz's medical records and considered them in light of the surveillance video and

14  report, and his consultations with Hertz's treating providers.  He then gave a reasoned opinion

15  where he explained why he disagreed with the conclusions of Hertz's treating physicians, why he

16  found no objective evidence that Hertz met the definition of disability under the Plan, and why he

17  believed Hertz could perform full-time sedentary work.  Therefore, in making its benefits

18  determination, Hartford's reliance on Dr. Rim's report (in conjunction with the other evidence)

19  was not an abuse of discretion.

20      **3.    *Hartford properly considered Hertz's award of Social Security benefits.***

21      In her Complaint, Hertz alleges that Hartford failed to consider her award of Social

22  Security benefits.  (Am. Compl. ¶ 37, Doc. # 28.)  Hartford anticipates that Hertz will argue that

23  the Social Security Administration's ("SSA") finding establishes that Hartford did an inadequate

24  investigation and wrongly denied her benefits.  The argument is severely flawed because the

25  Supreme Court has expressly warned that Social Security concepts and guidelines should not be

26  _____

27  [14] In light of the surveillance and other evidence, in this litigation Hartford could reasonably attack Hertz.  Hartford
will only address the merits, however.

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4827-7188-5332.1                                    25                          3:12-cv-00141-LRH-RAM
DEFENDANT HARTFORD'S MOTION FOR SUMMARY JUDGMENT

1  imported into ERISA cases because the two statutes serve different purposes through different

2  means. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832 (2003).   In rejecting an

3  argument that, like the SSA, ERISA administrators should give deference to the opinion of the

4  claimant's treating physicians (over their own reviewers), the Supreme Court noted there were

5  "critical differences between the Social Security disability program and ERISA benefit plans." *Id.*

6  | 7 | 8 | 9 | 10

> In contrast to the obligatory, nationwide Social Security program, nothing in ERISA requires employers to establish employee benefits plans. Nor does ERISA mandate what kind of benefits employers must provide if they choose to have such a plan. *Id.* Rather, employers have large leeway to design disability and other welfare plans as they see fit. In determining entitlement to Social Security benefits, the adjudicator measures the claimant's condition against a uniform set of federal criteria.  The validity of a claim to benefits under an ERISA plan, on the other hand, is likely to turn, in large part, on the interpretation of terms in the plan at issue.  *Id.*  at 833 (emphasis added) (internal quotations and citations omitted).

11  Hertz cannot argue that the Hartford did not give appropriate weight to the SSA decision.

12  The appeal denial letter clearly states that Hartford considered the SSA award in determining

13  whether benefits were payable to Hertz under the terms of the Plan.  However, Hertz's displeasure

14  with the outcome of her benefit claim does not establish that Hartford failed to consider the SSA

15  decision, particularly in light of the fact that Hartford specifically stated that the SSA award was

16  considered.

17  Moreover, the SSA's determination of disability cannot be compared to Hartford's

18  determination because Hertz has provided no evidence that the information before the SSA and

19  before Hartford were the same.  Hartford's decision was made based on the administrative record

20  before it, i.e. the documents and other information submitted by Hertz and her medical providers.

21  The SSA decision was made based upon the records, information and testimony before it.  There

22  is simply no way to determine whether the SSA considered the same information Hartford

23  reviewed.  In fact, it likely was not the same information because the SSA determination was

24  made long before Hartford's decision to terminate Hertz's LTD benefits was made.  Hartford's

25  decision to terminate Hertz's benefits was based on new evidence that was likely never considered

26  by the SSA.  This new evidence included updated medical records that provided no objective

27  evidence of Hertz's subjective complaints of pain, and the surveillance video which showed Hertz

28  engaging in activities inconsistent with her alleged physical limitations.  Thus, Hartford's

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4827-7188-5332.1                                        26                                3:12-cv-00141-LRH-RAM
DEFENDANT HARTFORD'S MOTION FOR SUMMARY JUDGMENT

1  consideration and treatment of the SSA decision does not warrant a less deferential standard of

2  review or establish that Hartford's termination of Hertz's LTD benefits was an abuse of discretion.

3  **IV.**

4  **CONCLUSION**

5    Hartford's claim decision is entitled to deference and should be upheld because Hartford

6  conducted a thorough claim investigation and reasonably terminated Hertz's benefits based on

7  substantial evidence set forth in the administrative record including: (a) the surveillance video and

8  report which shows that Hertz engaged in activities inconsistent with her self-reported limitations;

9  (b) Dr. Rim's independent review of Hertz's medical records in which he found no objective

10  evidence of impairment that would preclude Hertz from performing sedentary work; (c) Dr. Rim's

11  peer to peer consultations with Hertz's treating physicians wherein they confirmed Hertz's

12  complaints were subjective in nature; and (d) Hertz's own report of her daily activities and

13  limitations.  Accordingly, The Hartford did not abuse its discretion in denying Hertz's claim.

14  Hartford respectfully requests that the Court enter judgment in favor of Hartford.

15    DATED this 27 day of June, 2013

16              LEWIS BRISBOIS BISGAARD & SMITH LLP

17

18

19           By

20             KEITH A. WEAVER

           Nevada Bar No. 10271

21             6385 S. Rainbow Boulevard, Suite 600

           Las Vegas, Nevada 89118

22             Tel. 702.893.3383

           *Attorneys for Defendant Hartford Life and*

23             *Accident Insurance Company*

24

25

26

27

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1                             **CERTIFICATE OF SERVICE**

2       Pursuant to FRCP 5(b), I certify that I am an employee of Lewis Brisbois Bisgaard &

3 Smith LLP and that on this 27th day of June, 2013, I did cause a true copy of **DEFENDANT**

4 **HARTFORD'S MOTION FOR SUMMARY JUDGMENT** to be E-Filed and E-Served

5 through the EFP, to the following:

6 Vernon E. Leverty, Esq.
Patrick R. Leverty, Esq.
7 William R. Ginn, Esq.
LEVERTY & ASSOCIATES LAW CHTD.
8 832 Willow Street
Reno, NV 89502
9 Telephone:  775-322-6636
Facsimile:  775-322-3953
10 *Attorneys for Plaintiff*

11

12                  By _____

13                    An Employee of
LEWIS BRISBOIS BISGAARD & SMITH LLP

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

KEITH A. WEAVER
Nevada Bar No. 10271
LEWIS BRISBOIS BISGAARD & SMITH LLP
6385 S. Rainbow Boulevard, Suite 600
Las Vegas, Nevada 89118
PH.: 702.893.3383
FAX: 702.893.3789
E-Mail: weaver@lbbslaw.com
Attorneys for Defendant Hartford Life and
Accident Insurance Company

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| BARBARA HERTZ, | DECLARATION |
|---|---|
| Plaintiff, | |
| vs. | |
| HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY and GROUP LONG TERM DISABILITY PLAN FOR EMPLOYEES OF INTUIT, INC., | |
| Defendant. | |

1.    I, Bruce Luddy, make this declaration based on personal knowledge and I am competent to testify about the matters of fact set forth below:

2.    I am an adult resident in the State of Connecticut, where I am employed by Hartford Life and Accident Insurance Company ("Hartford") as Director of Litigation and Appeals.

3.    Based on my position, I am familiar with Hartford's policies and procedures regarding evaluating claims under employee benefit plans insured by Hartford.

4.    Hartford maintains a separate appeals unit for the consideration of claims that have been denied by the claims department on its initial review;

5.    Each Appeals Specialist in Hartford's appeals unit is charged with making

4839-2545-2820.1

1  an independent assessment of the adverse claim decision based on relevant provisions
2  in the governing Plan/policy and upon all of the evidence contained in the claim file;

3      6.    During the Appeals Specialist's review of a denied claim on administrative
4  appeal, the individual responsible for the appeal does not discuss the merits of the claim
5  with the Investigative Specialist who made the initial benefits determination, or the Claim
6  Specialist who approved the determination;

7      7.    In evaluating claims under employee benefit plans insured by Hartford, it is
8  Hartford's practice and intention to review such claims fairly, without regard to the manner
9  in which the plan is funded, and to consistently award benefits on claims that are entitled
10 to payment pursuant to the provisions of the applicable benefit plan while consistently
11 denying claims that are not entitled to such payments. Hartford administers claims in
12 substantially the same manner whether it is doing so under a fully insured policy or
13 pursuant to an administrative services only agreement;

14     8.    Hartford recognizes that awarding benefits on claims that are not eligible for
15 payment under the applicable plan/policy does not benefit all of the persons insured
16 under that plan/policy as a group. Instead, such payments could result in increased
17 premiums and/or a reduction or elimination of benefits by the employer, which will
18 ultimately work to the detriment of all participants and beneficiaries of a given plan;

19     9.    Hartford does not provide Investigative Specialists, Claims Specialists, or
20 Appeals Specialists with incentives, remuneration, bonuses, awards, achievements, or
21 other recognition based in whole or in part upon the denial or termination of claims.
22 Hartford's claims decision-makers are paid fixed salaries and performance bonuses that
23 are wholly unrelated to the number of claims paid or claims denied;

24     10.    Hartford's Investigative Specialists, Claims Specialists, and Appeals
25 Specialists are evaluated on the quality and accuracy of their claims decisions in
26 accordance with the applicable plan/policy documents. Hartford does not discourage its
27 claim decision-makers from paying legitimate claims;

28

4839-2545-2820.1               2

1     11.    Hartford's Investigative Specialists, Claims Specialists, and Appeals

2  Specialists are not involved in Hartford's financial decisions, including, but not limited to,

3  any review or analysis of Hartford's financial performance, or the financial performance or

4  claims experiences of any particular long-term disability plan insured by Hartford;

5     12.    Hartford's CIU, claims department, and appeals unit are completely

6  separate business units from the financial and underwriting departments;

7     13.    Neither CIU, claims, nor appeals personnel seek approval of Hartford

8  financial underwriters in connection with their decision-making on claims for disability

9  benefits;

10     14.    Hartford's financial and underwriting departments do not advise or influence

11  CIU, the claims department, or the appeals unit with respect to the denial or termination

12  of a claimant's benefits. Indeed, these units are kept separate from each other; and

13     15.    The office of the Chief Financial Officer of Hartford, and its affiliate,

14  subsidiary or parent companies, do not have any involvement and do not participate in

15  claims decisions on disability benefits at any level.

16     I declare under penalty of perjury under the laws of Connecticut that the foregoing

17  is true and correct.

    Dated this 25th day of June, 2013

18

19               By

20

21

22

23

24

25

26

27

28